UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| SHARON HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 6:18-cv-00183-GFVT |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| RYAN ZINKE, Secretary of U.S. Dept. | ) | **&** |
| of the Interior Office of Surface Mining | ) | **ORDER** |
| Reclamation and Enforcement Agency, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

In her fourteen-count complaint, Plaintiff Sharon Hall alleges she faced discrimination based upon her gender and disability while employed by the United States Department of the Interior, Office of Surface Mining Reclamation and Enforcement Agency. [R. 1.] She alleges violations of Title VII of the Civil Rights Act, the Americans with Disabilities Act of 1990, and the Kentucky Civil Rights Act. *Id.* She also raises state law claims of intentional and negligent infliction of emotional distress. *Id.* Defendant Ryan Zinke, in his official capacity as Secretary of the U.S. Department of the Interior, Office of Surface Mining Reclamation and Enforcement Agency, moves for partial summary judgment on twelve counts. [R. 47.] For the following reasons, Defendant's Motion is GRANTED.

**I**

Between 1987 and August 2013, Plaintiff Sharon Hall was employed by the United States Department of the Interior, Office of Surface Mining Reclamation and Enforcement Agency (hereinafter "OSM") as a Surface Mining Reclamations Specialist. [R. 1 at ¶ 12.] Her husband, Gary Hall, was likewise a Surface Mining Reclamations Specialist at OSM. Both operated out

of the London, Kentucky field office and primarily conducted Title V inspections.  [R. 57 at 3.]
Although Ms. Hall's primary focus was Title V inspections, she periodically performed Title IV[1]
inspections.  [R. 47-3 at 7.]  In deposition, Ms. Hall testified that "the Title V inspectors were
often called on to go out to emergency [Title IV] situations."  *Id.*

Sometime during 2012, London Field Office Director Joe Blackburn promoted Gary Hall
to Supervisor of the London office.  *Id.*  Subsequently, Ms. Hall was taken off Title V
inspections entirely and reassigned to Title IV inspections only.  *Id.*  According to OSM, OSM's
nepotism policy prevented Ms. Hall from being supervised by her husband.  [R. 47 at 5.]
Because there were no other Title V supervisors in the London office, Ms. Hall was reassigned to
Title IV inspections under supervisor Bob Evans.  *Id.*  To effectuate the change, OSM employee
Chet Edwards was taken off Title IV inspections and moved into Ms. Hall's former role as a
Title V inspector.  *Id.*  Although Ms. Hall's duties changed, her pay, pay grade, office location,
and benefits remained the same.  [R. 47 at 11.]

Rather than a simple reorganization, as Defendant describes, Ms. Hall characterizes her
shift from Title V to Title IV inspector as a "demotion," and argues that OSM's explanation of
avoiding nepotism is pretextual.  [R. 57 at 6.]  Ms. Hall contends that she was demoted to Title
IV inspector because she was a female and suffered from bipolar disorder.  *Id.*  Further, Ms. Hall
argues her "demotion" was done to make way for Chet Edwards, "a man, who did not have any
medical issues" whom OSM wanted to gain experience "to fill the supervisor position when
[Gary Hall], who was nearing the end of his career, retired.  *Id.*

---

[1]Title V inspections involve overseeing the regulation of active surface mining sites.  In contrast, Title IV
inspections are conducted on abandoned mine sites, through OSM's Abandoned Mine Land (AML) Reclamation
Program.  [*See* R. 47-3.]

2

As proof that Blackburn's explanation about nepotism is pretextual, Ms. Hall points to a similar situation that took place in a different OSM field office in Beckley, West Virginia. [R. 57 at 7.] Mark and Natalie Carter were both Title V inspectors when Natalie Carter was promoted to supervisor. *Id.* Ostensibly to avoid nepotism, Director of the Beckley Office Roger Calhoun arranged for Mark Carter to report to supervisor Rick Buckley in the Charleston, West Virginia office. *Id.* at 8. However, according to Ms. Hall, this reassignment was in name only, as Natalie Carter "for all intents and purposes . . . carried out the exact duties that Mr. Blackburn testified would have violated OSM's nepotism policy[.]" *Id.* at 7.

Not only does Ms. Hall contend the nepotism policy was not typically enforced, Ms. Hall says she proposed a similar arrangement to Blackburn. *Id.* Ms. Hall and John Chedester, a Senior Reclamation Specialist in the Lexington Field Office, agreed Ms. Hall could report to him. *Id.* This would allow Ms. Hall to remain in her Title V role without working directly under her husband. *Id.* Mr. Blackburn did not approve the arrangement. Because a similar arrangement was made in Beckley, and because Mr. Chedester was willing to supervise her, Ms. Hall argues that these facts demonstrate Blackburn had a discriminatory motive in denying this "accommodation" and instead assigning her to Title IV inspections.

Blackburn disputes that the motive was discriminatory. According to the defense, Mark Carter remained on Title V inspections in part because there were no dedicated Title IV inspectors in the Beckley office. [R. 47 at 4.] Roger Calhoun explained in his deposition that Title V inspectors were in high demand at the time, and Beckley was focusing on getting its Title V inspection numbers up. [R. 47 at 4.] Further, unlike Bob Evans in the London office, the other available supervisor in West Virginia— Rick Buckley— was qualified to oversee Title V inspections. *Id.* And although Ms. Hall says Mr. Chedester could have filled this role for her in

3

2013, OSM disputes that was an adequate alternative.  Unlike Rick Buckley in West Virginia, Mr. Chedester was not a supervisor.  [R. 47-9 at 14–15.]  Perhaps more importantly, in 2011 Ms. Hall accused Chedester of stalking her "to the point that [she]was ready to report him to the Kentucky State Police[.]"  [R. 60 at 6; R. 60-1.]  Ms. Hall initiated an EEOC complaint against him, but dropped the matter when Chedester was moved to the Lexington Field Office.  [R. 60-1.]

Whether or not the decision to assign Ms. Hall to Title IV inspections had a discriminatory motive, the parties agree that Ms. Hall was unhappy in that role.  [R. 57 at 6; R. 47 at 11.]  Ms. Hall describes her transition to Title IV work as "unbearable."  [R. 57 at 6.]  She was "required to familiarize herself with an entirely new reporting system and data base, had to learn a new job, and was forced to deal with the stigma and emotion that came with being stripped of an identity built over twenty-five years[.]"  *Id.* at 7.  While she continued to work in the same office as before, Ms. Hall says she became isolated in her new role, "because the other Title IV inspectors worked form their home and the job involved much more extensive travel than a Title V inspector."  *Id.*  Ms. Hall acknowledges that her production slowed down following the transition to Title IV inspections.  [R. 57 at 8.]  Ms. Hall says the change in circumstance "exacerbated her bipolar disorder, eventually forcing her to stop coming to work and retire three years earlier than planned."  *Id.*

The switch from Title V to Title IV inspections is not the only allegedly discriminatory treatment Ms. Hall experienced.  In the spring of 2013, after her switch to Title IV inspections, Ms. Hall says she was denied an opportunity to serve on the Remote Sensing Team, "a technical training program that was going to develop course materials and present course materials on

4

remote sensing of mine sites." [R. 47 at 11.] Ms. Hall says she was denied this opportunity in favor of Chet Edwards, she believes because she is female and has bipolar disorder. [R. 57 at 12–13.] Mr. Blackburn again disagrees as to the alleged motive, and says he did not approve Ms. Hall's request to join that team because her productivity had fallen off, and he "didn't think it was in her best interest or the Agency's to have her take on extracurricular projects . . . when she needed to basically catch up" on her regular inspections. [R. 47 at 11.]

        In addition to the Title IV assignment and exclusion from the Remote Sensing Team, Ms. Hall identifies a handful of other instances of gender discrimination over the years. In fact, her accusations against OSM span the entirety of her twenty-five-year career. [*See* R. 1; R. 57.] Ms. Hall says she was the only female inspector in her field office when she began there in 1987, and faced discrimination as a result. [R. 57 at 1–2.] Ms. Hall alleges she was not provided a female-tailored uniform in the early years of her career and instead was told to retrofit one of her husband uniforms; she was made to work on the computer system because she was not wanted in the field; and she was asked by a male colleague why she was qualified to work there when his wife was not. *Id.* Ms. Hall also alleges her male colleagues never invited her to eat meals with them, and when she was commended for her work, they would comment that she only received commendation because she was a woman. *Id.* at 2. Later, shortly after Gary Hall was promoted to supervisor,  a coworker "sexually harassed her by telling her he wanted to go to on overnight trips with her and without her husband, told her that she owed him sexual favors for helping her husband get a promotion, and even asked her to text him daily what color panties she was wearing." *Id.*

        In sum, Ms. Hall argues her reassignment to Title IV inspections and exclusion from the Remote Sensing Team were motivated by her gender and bipolar disorder diagnosis and

violative of Title VII and the ADA.  Ms. Hall further argues that the totality of the foregoing circumstances created a hostile work environment, and caused her to be constructively discharged from employment.  OSM disputes these claims, and argues that Ms. Hall cannot establish a prima facie case of discrimination based on sex or disability, because she can neither identify a similarly situated employee nor overcome OSM's nondiscriminatory reason for assigning her Title IV work and refusing to assign her to the Remote Sensing Team.  Further, OSM argues that Ms. Hall cannot meet the high legal standard applicable to her hostile work environment and constructive discharge claims.  Finally, because OSM is a federal agency, OSM argues Ms. Hall's Kentucky state law claims are barred by sovereign immunity.

## II

Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).  "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'"  *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact.  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case."  *Celotex Corp*., 477 U.S. at 325.  Once the movant has satisfied this burden, the non-moving party must

6

go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co*., 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).

## A

Before addressing the merits of Ms. Hall's claims, the Court must address one point of clarification. Among the counts included in OSM's motion for partial summary judgment are Counts 1, 2, and 8 of the Complaint [R. 1] which allege violations of the Americans with Disabilities Act (ADA). As a federal employee, Ms. Hall's exclusive remedy for employment-related discrimination based on disability is the Rehabilitation Act. *Peltier v. United State*, 388 F.3d 984, 989 (6th Cir. 2004) ("[T]he Rehabilitation Act, 29 U.S.C. § 791, *et seq.*, [] provides the remedy for federal employees alleging disability discrimination."); *cf.* 42 U.S.C. § 1211 (5)(B) (expressly excluding the United States or a corporation wholly owned by the United States as an "employer" under the ADA). There is no significant difference between the substantive standards of the ADA and the Rehabilitation Act. *See* 29 U.S.C. § 791(f) ("The standards used to determine whether this section has been violated . . . shall be the standards applied under title I of the Americans with Disabilities Act of 1990[.]" ). Accordingly, the court construes Ms. Hall's

7

ADA claims as claims made pursuant to the Rehabilitation Act.


**B**

Under Title VII of the Civil Rights Act of 1964, employers are prohibited from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Similarly, the Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

A plaintiff can prove her claims by either direct or circumstantial evidence of intentional discrimination.  *Ondricko v. MGM Grand Detroit, LLC,* 689 F.3d 642, 648–49 (6th Cir. 2012).  "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003)); *see also Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir. 2004) (direct evidence "proves the existence of a fact without requiring any inferences").  On the other hand, circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a fact finder to draw a reasonable inference that discrimination occurred."  *Wexler*, 317 F.3d at 570.

Ms. Hall raises only circumstantial evidence of sex and disability discrimination.  Her evidence includes that she essentially traded jobs with Chet Edwards, a male without any

disabilities, and was denied membership on the Remote Sensing Team while Chet Edwards was included on that team, and that unlike Mark Carter, she was not allowed to remain in her position when her spouse was promoted.

The burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to discrimination claims brought under Title VII and under the Rehabilitation Act and based upon circumstantial evidence.  *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).  Under *McDonnell Douglas,* the plaintiff must first establish a *prima facie* case of discrimination.  *Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 264 (6th Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Products, Inc .,* 530 U.S. 133, 148 (2000)).  If successful, the burden then shifts to the defendant employer to "articulate a legitimate nondiscriminatory reason for the adverse employment action."  *Id.* (citation omitted).  Once this showing has been made, the burden of production shifts back to the plaintiff who must show that the employer's explanation was merely pretext for intentional discrimination.  *Id.* (citation omitted).  Importantly, the burden of production shifts throughout the analysis, but the burden of persuasion remains on the plaintiff to demonstrate that membership in the protected class is "the 'but-for' cause of their employer's adverse action."  *Id.* (quoting *Geiger,* 579 F.3d at 620) (internal quotations marks omitted).

**1**

Under the *McDonnell-Douglas* framework, Ms. Hall must first establish a *prima facie* case of gender discrimination by showing that: "(1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified [for the position at issue], and (4) she was treated differently than [or replaced by] similarly-situated male and/or nonminority employees for the same or similar conduct."  *McClain v. NorthWest Community*

9

*Corrections Center Judicial Corrections Bd.,* 440 F.3d 320, 332 (6th Cir. 2006); *see also Lewis v. Norfolk S. Ry. Co.*, 590 F. App'x 467, 469 (6th Cir. 2014) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)).  With respect to her disability discrimination claim, Ms. Hall must similarly show (1) that she is an individual with a disability; (2) was qualified to perform her job with our without reasonable accommodation; and (3) was discriminated against solely because of her disability.  *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002).

Here, there is no dispute that Ms. Hall, as a woman, is a member of a protected class in the context of her gender discrimination claims.  Likewise, there is no dispute that her diagnosis of bipolar disorder qualifies as a disability.  The parties also do not dispute that Ms. Hall was a qualified Title V inspector prior to being reassigned to Title IV inspections.  [*See* R. 47 at 3; R. 57 at 1.]  Instead, OSM argues her claims must fail because Ms. Hall cannot demonstrate that she was treated differently to similarly situated male employee, or a similarly situated employee without a disability.

 "[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citations omitted).  Put differently, Ms. Hall must show that the comparable employees are similarly situated "*in all respects*."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original).  While this standard is not necessarily construed by courts to require an exact comparison between the plaintiff and other employees "in every single aspect of their employment," *Ercegovich v.*

10

*Goodyear Tire & Rubber Co*., 154 F.3d 344, 352 (6th Cir. 1998), Ms. Hall still must show that "similarity between the compared employees [] exist[s] in all relevant aspects of their respective employment circumstances." *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011).  Indeed, "[a]bsent proof that other employees were similarly situated, it is not possible to raise an inference of discrimination." *Nickell v. Memphis Light, Gas & Water Div*., 16 F. App'x 401, 402 (6th Cir. 2001) (quoting *Shah v. General Elec. Co.*, 816 F.2d 264, 270 (6th Cir. 1987)).

Ms. Hall argues she was similarly situated to two male employees: Mark Carter and Chet Edwards.  [R. 57 at 10–17.]  As explained in more detail above, Mark Carter was a Title V inspector in the Beckley, West Virginia office of OSM.  When his wife, Natalie, was promoted to supervisor, Mark continued to perform Title V inspections, but began reporting to supervisor Richard Buckley.  Ms. Hall argues she is similarly situated to Mark Carter because they were both Title V inspectors, and both of their spouses were promoted to supervisor.  [R. 57 at 12.] Ms. Hall also argues that comparing her treatment with that of Mark Carter proves Blackburn's reason for transferring Ms. Hall—OSM's nepotism policy—was pretextual.  According to Ms. Hall, comparing their situations demonstrates pretext in two ways.  First, Mark Carter was allowed to remain in his Title V position, but was assigned to report to a supervisor other than his wife.  Ms. Hall proposed a similar solution wherein she would continue to perform title V inspections, and report to Mr. Chedester instead of her husband.  [R. 57 at 8.]  Mr. Chedester consented to this arrangement, but Blackburn did not approve the plan.  *Id.*  Second, although Mark Carter was supervised by Rick Buckley on paper, Ms. Hall contends that Mark continued to receive assignments from his wife.  Thus, Ms. Hall apparently concludes that the nepotism

11

policy was not actually enforced against Mark Carter, and should not have been enforced against her.[2]

Ms. Hall and Mark Carter's situations parallel one another in many ways.  Regardless, Ms. Hall is not similarly situated to Mark Carter in "in all respects."  Mark Carter and Ms. Hall were both OSM mine inspectors, but in different offices, in different states, under different supervisors who themselves reported to different directors.  Blackburn had no influence over the arrangements made for Mark Carter following Natalie Carter's promotion.  Ms. Hall cannot demonstrate discrimination on the basis that someone, somewhere, made a decision that was different from that made by Mr. Blackburn when presented with similar facts.

Ms. Hall also argues that she is similarly situated to Chet Edwards, a male employee without documented disability who worked in the London Field Office.  This is a closer question.  OSM argues Ms. Hall is not similarly situated to Mr. Edward "on perhaps the most relevant aspect: Edwards is not married to Gary Hall."  [R. 60 at 3.]  But if that were the requirement for identifying a similarly situated employee, the task would be next to impossible. *See Seay v. TVA*, 339 F.3d 454, 480 (6th Cir. 2003) (emphasizing the need to "make an

---

[2] The record is not totally complete on this point.  Testimony from Blackburn reflects that randomized, computer generation plays the primary role in assignment distribution.  [R. 47-8 at 20.]  And the independent investigation cited Ms. Hall says that Natalie Carter assigned Mark Carter some inspections "because of the nature of splitting up the work," but that she "consults with Mr. Buckley on these assignments" and Mr. Buckley "has the ability to override her[.]"  [R. 57-11 at 13.]  Further, it was Mr. Buckley who was ultimately responsible for evaluating Mark Carter's performance.  *Id.*  Ms. Hall contends that " [u]nofficially, Ms. Carter was, in fact, Mr. Carter's supervisor in all the relevant ways that Mr. Blackburn testified would violate the OSM nepotism policy," but Mr. Blackburn does not testify to that fact.  Instead, when asked he answers that he doesn't know whether certain activities violate the nepotism policy, and that he knew only that a spouse could not supervise another spouse, which he was told by the personnel department in Washington, D.C.  [R. 57-2 at 18-21.]  Whether the Carters' arrangement in Beckley violated the nepotism policy is a legal conclusion not contained in the record before the Court.

12

independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.").

Putting aside that only Ms. Hall was married to Gary Hall, there are several similarities between Ms. Hall and Chet Edwards. Ms. Hall and Mr. Edwards were both OSM Surface Mining Reclamations Specialists within the London Field Office. They were both qualified[3] for the Title V position. They essentially switched jobs at the direction of Director Blackburn, whom they both worked beneath. Ms. Hall says she was taken out of her position as Title V inspector to make way for Mr. Edwards, who previously performed only Title IV inspections, because OSM wanted somebody in that position who was male and without disability. Further, although they were both apparently qualified, Ms. Hall was denied a spot on the Remote Sensing Team, while Mr. Edwards was included. On balance, the Court finds that Ms. Hall and Mr. Edwards were similarly situated.

**2**

Once the plaintiff establishes a *prima facie* case of discrimination the burden then shifts to the defendant employer to "articulate a legitimate nondiscriminatory reason for the adverse employment action." *Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 264 (6th Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Products, Inc .,* 530 U.S. 133, 148 (2000)). OSM counters that its nepotism policy necessitated Ms. Hall's transfer to Title IV, and that she was not put on the Remote Sensing Team because her productivity had declined such that she was behind on her regularly assigned work. With this explanation, the burden shifts back to Ms.

---

[3] Ms. Hall disputes that Mr. Edwards was qualified to do Title V inspections because he had no experience doing them at the federal level. The parties agree in that regard; however, even taken in the light most favorable to Ms. Hall, Mr. Edwards was not as inexperienced as she argues. The record reflects that Mr. Edward had years if not decades of experience working for the state of Kentucky in a similar capacity, and it was just "federal procedures" with which Mr. Edwards was not familiar. [R. 47-9 at 30–32.]

13

Hall, who must show that OSM's explanation was merely pretext for intentional discrimination. *Id.* (citation omitted).

Sixth Circuit precedent establishes that a jury "may not reject an employer's nondiscriminatory explanation unless there is sufficient basis in the evidence for doing so" because "[t]o allow the jury to simply refuse to believe the employer's explanation would subtly, but inarguably, shift the burden of persuasion form the plaintiff to the defendant[.]" *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). Therefore, to rebut OSM's explanation, Ms. Hall must demonstrate one of three things: (1) that OSM's reasons have no basis in fact; (2) that the proffered reasons did not actually motivate the adverse action; or (3) that the proffered reasons were insufficient to motivate the adverse action. *See id.* at 1084.

The Court draws all inferences in favor of the non-movant. Still, Ms. Hall is unable to point to any evidence in the record, aside from her own conjecture, that either of these non-discriminatory explanations were pretextual. Ms. Hall does not argue that there is no nepotism policy, or that she was not declining in production when she asked to be put on the Remote Sensing Team. Therefore, Ms. Hall is apparently arguing that OSM's proffered explanations did not actually motivate its action, or that it was insufficient to motivate its action.

To establish the foregoing, Ms. Hall points to the Beckley Office and what occurred there. But deposition testimony from Mr. Blackburn and Mr. Calhoun establishes that the two offices had very different needs at the time related to Title V and Title IV inspections, which explains the necessity of keeping Mark Carter on Title V despite Natalie Carter's promotion. [*See* 47-2 at 9–11; R. 47-8.] Her argument that Natalie continued to act as Mark's supervisor "for all intents and purposes" is also insufficient to show pretext. Evidence cited by Ms. Hall

14

establishes that at the very least, Mark Carter had a different supervisor responsibility for his performance evaluations and reviews. [R. 57-11 at 13.] While Natalie could review Mark's reports for completeness, the record reflects that substantive matters were handled by Buckley. [R. 47-2 at 9-12.] This seems to support, rather than negate, Blackburn's explanation that OSM's nepotism policy motivated Ms. Hall's transfer.

Further, the record reflects that even before Mr. Hall was offered the position of supervisor, Ms. Hall and Gary Hall were informed of the need to transfer Ms. Hall to Title IV should Mr. Hall take the position. Nor does Mr. Blackburn's refusal to assign Chedester as Ms. Hall's supervisor support her discrimination claim. Not only was Chedester not a supervisor, the record reflects that Ms. Hall at one point filed an EEOC claim against Chedester in which she accused him of stalking her to such an extent that she wanted to involve police. [R. 60-1.] Her argument that Mr. Edwards was given her position in order to groom him for promotion, apparently based on some favoritism toward him, is also unavailing. Even if true, favoritism for Edwards is not equivalent to discrimination against Ms. Hall on the basis of sex or disability.

With respect to a position on the Remote Sensing Team, Mr. Blackburn testified at deposition that, following her transition to Title IV inspections, Ms. Hall's productivity slipped, and he didn't think it was in her best interest or the Agency's to have her take on extracurricular projects . . . when she needed to basically catch up" on her regular inspections. [R.47 at 11.] Ms. Hall points to no evidence that would dispute this. In fact, she admits that her inspection work declined significantly. [R. 57 at 8, 20.] The only inference to be drawn is that Ms. Hall's production declined, she fell behind, and Blackburn reasonably decided not to aplace her on an additional assignment at that time.

Ms. Hall has failed to carry her burden of persuasion on the issue of pretext. Even

drawing all reasonable inferences in her favor, she has not proved by a preponderance of the evidence that her transition to Title IV motivated by discrimination, nor that discrimination was the reason for holding her back from the Remote Sensing Team.  Counts 7 and 8 are DISMISSED.

### B

### 1

A hostile work environment based on sex discrimination occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  Importantly, "the conduct underlying a sexual harassment claim need not be sexual in nature.  *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may . . . constitute a hostile work environment. . . ." *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (emphasis in original).

As before, Ms. Hall must establish a *prima facie* case of hostile work environment due to sex discrimination.  Therefore, Ms. Hall must establish (1) that she was a member of a protected class; (2) that she was subjected to unwelcomed harassment; (3) the harassment was based on her sex; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability.  *See Barrett v. Whirlpool Corp.*, 557 F.d 502, 515 (6th Cir. 2009) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).  The Sixth Circuit has held that when

assessing the fourth prong of this test, the court should look at the totality of the circumstances when considering:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Conduct must be extreme to amount to a change in the terms and conditions of employment.  Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Barrett*, 556 F.3d at 515-16 (citations omitted).

It is not entirely clear which allegations Ms. Hall rests upon to support her hostile work environment claims.  To the extent she argues her assignment to Title IV and exclusion from the Remote Sensing Team contributed to the hostile work environment, the Court declines to consider this evidence.  As explained above, Ms. Hall has failed to carry her burden and establish that these decisions were based on her gender.  Therefore, these instances should not be considered.

Ms. Hall's other examples of gender discrimination allegedly occurred in the late 1980s and early 1990s, in the beginning days of her career at OSM.  Specifically, Ms. Hall alleges she at first was not provided a female-tailored uniform and instead was told to retrofit one of her husband uniforms; she was made to work on the computer system because she was not wanted in the field; and she was asked by a male colleague why she was qualified to work there when his wife was not.  [R. 57 at 1–2.]  Ms. Hall makes no allegations of gender discrimination in the following years until 2013, following Gary Hall's promotion to Supervisor.  Following the promotion, a coworker "sexually harassed her by telling him he wanted to go to on overnight trips with her and without her husband, told her that she owed him sexual favors for helping her husband get a promotion, and even asked her to text him daily what color panties she was

17

wearing." *Id.*

The Court acknowledges that the coworker's comments are crass and completely inappropriate. Even so, this accusation combined with "simple teasing, offhand comments" and "offensive utterance[s]" from decades earlier does not rise to the level of a hostile work environment. The conduct alleged by Ms. Hall is much less pervasive than the conduct alleged in *Morris v. Oldham County Fiscal Court*, wherein the Sixth Circuit found the plaintiff had failed to demonstrate a hostile work environment. 201 F.3d 784 (6th Cir. 2000). There, plaintiff alleged her supervisor (1) made several dirty jokes in her presence; (2) made verbal sexual advances related to her performance evaluation; (3) made a one-time reference to plaintiff as "hot lips"; and (4) made "isolated comments about plaintiff's state of dress," all within a span of two years. *Id.* at 790. Ms. Hall's allegations, all but one of which are objectively milder, span over twenty-five years. The record does not support that Ms. Hall experienced conduct "severe or pervasive enough to create an objectively hostile or abusive work environment[.]" *Id.* (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)).

**2**

Ms. Hall also alleges hostile work environment based on discrimination against her because of her bipolar disorder. [R. 1.] Aside from her reassignment to Title IV and exclusion from the Remote Sensing team, Ms. Hall identifies no instances of discrimination based upon her disability. As explained above, Ms. Hall cannot establish Blackburn's explanation for his decisions on these matters is pretext. Therefore, these do not support her claim of hostile work environment, and there is no other evidence in the record to support the claim. Accordingly, Count 1 of Ms. Hall's complaint is dismissed.

18

**C**

OSM also seeks summary judgment on Counts 2 and 6 of plaintiff's complaint, which allege constructive discharge. [R. 47.] In order to demonstrate constructive discharge, a plaintiff must show that (1) "the employer . . . deliberately created intolerable working conditions, as perceived by a reasonable person," and (2) "the employer did so with the intention of forcing the employee to quit . . . ." *Logan v. Denny's*, 259 F.3d 558, 568–69 (6th Cir. 2001) (internal citations omitted). The Sixth Circuit has adopted several factors for the Court to consider in assessing whether working conditions are intolerable to a reasonable person. These include:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 569.

Ms. Hall characterizes her reassignment to Title IV as a demotion and testified in her deposition that Title IV inspectors had less authority than Title V inspectors. [*See* R. 57-1.] Even if true, there is no evidence in the record demonstrating that her reassignment was done "with the intention of forcing [Ms. Hall] to quit." *Denny's*, 259 F.3d at 568–69. Counts 2 and 6 are dismissed.

**D**

As final matter, the Court addresses Ms. Hall's state law claims. Counts Nine through Fourteen of Ms. Hall's complaint allege violations of the Kentucky Civil Rights Act and raises state law claims of intentional infliction of emotional distress and negligent infliction of emotional distress. [R. 1 at ¶¶ 93–121.] In 1972, Congress amended Title VII to include federal

19

employees, and thereby waived United States' sovereign immunity against such claims. *See Loeffler v. Frank*, 486 U.S. 549, 558–59 (1988). Through passage of the Rehabilitation Act, congress created "a federal employee's exclusive remedy for employment related discrimination based on disability." *Plautz v. Potter*, 56 F. App'x 812, 815 (6th Cir. 2005).

As a federal agency, OSM argues that it is protected against such claims by the doctrine of sovereign immunity. [R. 47 at 17.] According to OSM, "[a]s the United State has waived sovereign immunity only as to Title VII and the Rehabilitation Act, and not Kentucky state law claims on these topics, this Court should dismiss Ms. Hall's duplicative state law claims." *Id.* Not only is OSM's position correct under the law, but Ms. Hall does not dispute or even address this argument in her Response. [R. *See* R. 57.] Therefore, the Court will grant summary judgment to the Defendant on Counts Nine through Fourteen of the complaint.

### III

Ms. Hall succeeds in establishing a prima facie case of discrimination based on her sex and disability. But she is unable to establish that OSM's non-discriminatory explanation for its actions toward her is pretext. Therefore, Ms. Hall fails to carry her burden of persuasion under the *McDonnel-Douglas* framework. Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that Defendant's Motion for Partial Summary Judgment [R. 47] is **GRANTED**. Counts One, Two, Four, and Sixth through Fourteen of Ms. Hall's complaint [R. 1] are **DISMISSED**.

20

This, the 14th day of July, 2020.

Gregory F. Van Tatenhove
United States District Judge